The People of the State of Illinois ex rel. Helen G.
Carpenter, Appellee, v. William E. Dever, Mayor,
and Herman N. Bundesen, Health Commissioner,
of City of Chicago, Appellants.

Gen. Nos. 29,342, 29,343.

MANDAMUS—*duty of health commissioner in recommending li-
censing of clinics as discretionary.* Under sections 1832 to 1840 of
the ordinances of the City of Chicago making it the duty of the
health commissioner to investigate applications for the establish-
ment of free dispensaries and to make recommendations to the
mayor as to the issuance of licenses therefor, the commissioner is
vested with a discretion in the matter and he will not be compelled
by mandamus to recommend the issuance of a license for the es-
tablishment of a dispensary for the giving to poor people of in-
formation as to birth control.

Consolidated appeals by defendants from the Circuit Court of
Cook county; the Hon. HARRY M. FISHER, Judge, presiding. Heard
in the second division of this court for the first district at the
March term, 1924. Reversed. Opinion filed February 3, 1925.

FRANCIS X. BUSCH, FRANK M. PADDEN and McCOR-
MICK, KIRKLAND, PATTERSON & FLEMING, for appel-
lants; ALBERT H. VEEDER, DANIEL V. GALLERY, PERRY
S. PATTERSON and WILLIAM H. SYMMES, of counsel.

GEORGE PACKARD and HAROLD L. ICKES, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the
court.

One of these appeals is from a judgment of the
circuit court of Cook county, entered after a hearing
without a jury on November 23, 1923, awarding a
peremptory writ of mandamus, commanding the re-
spondent, Herman N. Bundesen, health commissioner
of the City of Chicago, to approve and recommend,
and the defendant, William E. Dever, mayor of the

city, to issue, "a license to the Parents' Clinic to open a free clinic, at No. 1347 North Lincoln Street, Chicago, to furnish free medical advice to needy parents with regard to limiting and spacing procreation according to the health and welfare of the individual and family, as prayed for in the petition, and in accordance with the application for such license already on file in the office of said health commissioner."

Before the expiration of the term, respondents moved to have the judgment vacated and the motion was continued. It was supported by the affidavit of an assistant corporation counsel of the city, in which he stated that "the ends of justice would be best served by permitting the respondents to introduce further testimony upon the points covered by the evidence of the petitioner." On January 22, 1924, the court heard the testimony of eight of respondents' witnesses, who were examined and cross-examined at length. Before hearing this testimony the court ruled in substance that the same would be treated as if in the form of affidavits supporting the motion to vacate; that if the court was of the opinion that it ought to consider the same in connection with its previous decision, it would do so; and that if the same was not of such a character as to affect the final result the court would overrule the motion and such testimony might be preserved in an additional bill of exceptions, so as to give respondents the benefit of it in a court of review. After hearing the testimony the court overruled respondents' motion to vacate and they prayed and perfected an additional appeal from that order. After the two appeals were docketed in this Appellate Court they were ordered consolidated for hearing. The two bills of exceptions are contained in the present transcripts.

The pleadings in the cause consist of the relatrix's verified petition, filed October 11, 1923, the joint answer of the respondents, and a replication. In the

petition certain ordinances of the city (being sections 1832 to 1840, inclusive, in the article headed "Dispensaries" and contained in the Chicago Municipal Code of 1922 in the chapter entitled "Health") are set forth in full. Section 1832 provides:

"For the purpose of this article a dispensary is hereby defined to mean any place or establishment, exclusive of hospitals and drug stores, where free medical or surgical advice or treatment is given, and where drugs and remedies are dispensed, or any place or establishment advertised or announced, as giving free medical or surgical advice or treatment, or as giving drugs and remedies without charge, or any place or establishment advertised, announced, conducted or maintained under the name 'dispensary' or 'clinic.'"

Section 1833 declares it to be unlawful for any person, etc., to open, conduct or maintain any dispensary as above defined without first obtaining a license. Section 1834 prescribes the nature and contents of the written application for a license, and declares it to be the duty of the health commissioner, upon presentation of such application

"to make * * * strict inquiry into the facts set out in such application, and if upon such inquiry he shall find such dispensary is or is intended to be so constructed and equipped as to afford proper accommodations for the care of the persons treated or proposed to be treated therein, and that the physician or physicians * * * thereof will give, or is or are under agreement to give, such attendance therein as will render him or them responsible professionally for the medical or surgical treatment given or to be given to any and all indigent persons applying thereto, and that such physician or physicians is or are regularly authorized to act as such under the laws of the State of Illinois, then the said commissioner of health shall recommend to the mayor that a license be issued, and upon the payment by the applicant of the license fee * * * the mayor shall issue * * *

a license, * * * authorizing such applicant to open, conduct * * * or maintain for the current municipal year a dispensary at the place, in the manner and for the purpose in such application set forth.''

Section 1835 fixes the annual license fee at $25 and also the end of the term of the license. Section 1836 sets out certain sanitary requirements at the dispensary, and that

''There shall be provided in each dispensary a suitable room, approved by the commissioner of health, to be used for the isolation of cases of communicable diseases that may be found in such dispensary. The room or rooms thus provided shall have separate toilet facilities and a supply of running water.''

Sections 1837 and 1838 prescribe regulations for the keeping of records of the work done and of the making of reports of the work and as regards contagious diseases. Section 1839 provides for the inspection of such dispensary by the health commissioner and for his revocation of a license at any time for cause. Section 1840 prescribes certain penalties for violations of the ordinances.

It is alleged in the petition that the relatrix is a citizen of Chicago and president of the ''Parents' Clinic,'' a voluntary organization of men and women, associated ''to extend, free of charge, advice and treatment to married people where the physical condition of the parents is such as to make the bearing of children dangerous or prejudicial to the health and welfare of the wife or child.'' The names of the executive board and advisory council of the clinic are set forth, and it is further alleged that the relatrix, pursuant to the ordinances, made application in its name for a license, wrote a letter to the health commissioner and inclosed a check for the license fee. The letter is set forth in full, in which the relatrix says that the necessary frontage consents have been obtained, and that ''all other requirements and regulations of the laws and ordinances are ready to be

complied with." She also mentions the purpose of the "Parents' Clinic," as above, and further says in part:

"It is not at all the object to publish broadcast methods of contraception, but rather to prevent, in every manner rational and proper, recourse to abortion now too prevalent, and to avoid as far as humanly possible the burdening of the community with defective children, and the ruination of the health of countless mothers. It is intended to instill as far as possible educative principles of self-control, that we are confident will make for the betterment of the human race, where unrestrained ignorance and weakness are bound to contribute to needless suffering and dependence.

"The Clinics are to be conducted always under the personal supervision and care of competent, high-minded physicians. The idea is to provide for the poor who need it most, the same facilities that the more fortunate may obtain at any time from their own physicians, and at the same time save them from the wiles of irresponsible quacks. * * *"

It is further alleged in the petition that subsequently she received the written refusal of the health commissioner to recommend the issuance of a license upon such application and letter, and requesting further facts, etc., and that on September 8, 1923, she filed an amended application. This is set out in the petition and is in part as follows:

"Location of the Parents' Clinic.—1347 N. Lincoln Street, Chicago.

"Purpose for which it is to be opened, conducted and maintained.—To furnish free medical advice to needy parents with regard to limiting and spacing procreation according to the health and welfare of the individual and family.

"Accommodations for Patients and Inmates.—5 Rooms on first floor of two-story house, according to plat attached hereto. No permanent patients.

"Nature and kind of Treatment or Care.—*Approved methods of contraception, and advice consistent with family welfare in each case.*

"Name and Address of the Principal Physician, Superintendent or person in charge.—Dr. Rachelle Yarros, 800 S. Halsted St., Chicago."

A plat accompanied this application, also a letter written by Dr. Yarros, and also a second letter written by relatrix. From the plat it does not clearly appear that provision is made for an isolation room, equipped as provided in section 1836 of said ordinances. In the letter of Dr. Yarros, in addition to stating her experience and qualifications as a physician, she agrees, as the physician to be in charge of the proposed clinic, to give "such attendance therein as will render me responsible professionally for the medical treatment given or to be given to any and all indigent persons applying thereto, and to all others whom I may there treat." In relatrix's letter she writes in part:

"The Nature and Kind of treatment can only be generalized in the application, as it differs in accordance with the necessities of each case. Dr. Yarros will be glad to explain the methods to you in detail, if you desire, by personal interview at any time."

It is further alleged in the petition that the health commissioner, "contrary to his legal duty in that behalf as imposed upon him by said ordinances, willfully and arbitrarily refused to recommend to said William E. Dever, mayor, the issuance of said license," and that said refusal is embodied in his letter of September 19, 1923. This letter is also set forth, in which the commissioner, after referring to statements made in the application and in the letters of relatrix and Dr. Yarros, disapproves the application, refuses to recommend to the mayor the issuance of a license thereunder, and returns the license fee, writing in part as follows:

"The application is still defective in two respects:

"(1) Dr. Yarros should state such *facts* as will enable me to determine whether she will give, or is under

agreement to give, such attendance as will render her responsible professionally for the medical or surgical treatment given or to be given by her. This fact is to be determined by me and not by the attending physician.

"(2) With reference to the 'nature and kind of treatment' to be given, the application does not in any respect state the nature or kind of treatment. It is in fact merely a repetition in a more limited form of the purpose for which it is desired to open the dispensary.   *   *   *

"The application should state the nature and kind of treatment to be given with such detail and particularity as would enable me to pass upon the applicability of the treatment proposed to the ailment sought to be treated, and also as to whether it would be injurious to health in other respects.

"I am therefore, disapproving the application upon each of the above grounds. *There is further objection* to this application, upon which, in my opinion, it must be disapproved; that is, that *the purpose* for which it is desired to be established *is against public policy, tends to corrupt morals, and is unlawful.* *   *   *

"The advocating of prevention of conception is contrary to public policy as clearly indicated by City Ordinances and Act of Congress. In fact, it appears from the papers accompanying the application that it has been forbidden by statute in half of the states of the Union."

The commissioner then cites sections 2672-73 of the Municipal Code of 1922, and section 211 of the Penal Laws of the United States, and continues:

"The fact that the City Ordinances and the Federal Statute prohibit the dissemination of information of how, where and by what means conception may be prevented, establishes, I believe, that in the opinion of the City Council and Congress, the prevention of conception and the teaching of prevention of conception are against public policy.

"You apparently recognize that the unrestricted

dissemination of such knowledge might be harmful, because you disclaim any intention to publish broadcast your method of control, but when you once impart that knowledge to a patient it has passed beyond your control and may be spread broadcast (in any manner not prohibited by the City Ordinance or Act of Congress) and thus come into the possession of unmarried people and also adolescent children. With the fear of conception removed there would, no doubt, be a great increase in sexual immorality and unless your method of prevention is fool proof and absolute, a great increase in illegal pregnancy would result which would lead no doubt to increased abortions and thus defeat one of the express purposes stated in your letter. * * *

"The fact that there is no statute in the State of Illinois prohibiting the teaching of prevention of conception does not justify me in approving the licensing of any practice or teaching which, in my opinion, would tend to corrupt morals, injure health, increase crime or destroy the state, and as I am of the opinion that the practice or teaching of prevention of conception would tend in any of these directions, I feel that it is my duty to disapprove the application."

It is further alleged in the petition that on September 27, 1923, the relatrix made a written demand upon the mayor that he issue the license but that he refused to do so.

In the joint answer of the respondents the existence of the ordinances set out in the petition, and respondents' refusals to issue the license, are admitted, but it is denied that such refusals were arbitrarily made or were contrary to their legal duties. It is averred *inter alia* that the relatrix in both applications failed to state such facts as would make it possible for the commissioner to determine whether or not the treatment to be given at the clinics was lawful or unlawful, or was or was not detrimental to the health or morals of the community. The existence of any "approved methods of contraception" is denied. And it is further

averred that the proposed teachings and practices would result in the dissemination of information that would come to the knowledge of young men and women, married and unmarried, and be productive of disastrous results, and, that the establishment of such a clinic would open the door to quacks, who might demand licenses for similar clinics and thereby prey upon the public for mercenary ends. It is also averred that the dissemination of information concerning contraception is in violation of certain ordinances of the City of Chicago, being sections 2671, 2672 and 2673 of said Municipal Code of 1922, which are set out *in hæc verba* in the answer. Sections 2671 and 2672 prohibit the selling, giving away or distributing of books, pamphlets, etc., upon streets, sidewalks, parks, etc., in the city, giving information as to "articles or means of preventing conception." Section 2673 prohibits the publication and circulation of advertisements in the city which give information "for the purpose of preventing conception."

To the answer the relatrix filed a replication alleging that "there are approved methods of contraception that are the only methods proposed to be used by the relatrix and the Parents' Clinic, and none of which are such as are detrimental to the health of persons upon whom or by whom said methods are used."

On the trial the relatrix called as witnesses five physicians, and the respondents one witness—Dr. Hirshfield, a physician and a member of the staff of said health commissioner. On the hearing of respondents' motion to vacate the judgment the respondents called as witnesses seven physicians, including said health commissioner, Dr. Bundesen, and one Casper L. Redfield, a writer on physiology and heredity for medical journals.

One of relatrix's witnesses was Dr. Rachelle S. Yarros, who, if a license were issued, would be the physician in charge of the clinic. She testified on direct examination that she had practiced as a physi-

cian in Chicago since 1894, that for the last 20 years her practice had been entirely in obstetrics and diseases of women; that she had had occasion in her practice to advise married persons as to methods of preventing conception, "in cases of tuberculosis, heart disease, kidney disease and in cases of extreme poverty;" that she had studied the question of contraception and had attended several conferences of physicians in this and other countries called to consider the question; that in her opinion there were two methods of preventing conception "that are generally accepted and practiced by the profession;" that these two are "(1) condoms, and (2) the French pessary"; that, based on her experience and observation "and the consensus of opinion of others who had had similar experience," she was of the opinion that these methods were "not injurious to the health or well-being of the person who used them"; that said two methods "are to be used in connection with the Parents' Clinic, * * * and only those"; and that "it will be the purpose of this clinic, in addition to advising what instruments to use, to discourage the use, and to educate the patients that will come there as to the dangers, if any, of the methods which are injurious." On cross-examination, after stating that the word "contraception," as she understood it, meant "to prevent pregnancy," and that a "free clinic" is "a place where people who need medical advice come, * * * where just free treatment and advice are given," she described a French pessary and how used and how properly applied. She further testified in substance that, if a physician were to rent a store and put a sign in the window, "Birth Control Clinic," and then invite the public in and give information as to how to use condoms and French pessaries, she would not call it a medical clinic, and for the reason that it would "not be for poor people," but that, if such a place were established "for the sole

purpose of advising poor people that would come there as to methods of using the French pessary, without any examination of the condition of the patient and without knowledge of any pathological conditions being present," and such advice was given, she would call it a clinic "in the broad sense"; that in conducting the proposed clinic she would not ignore the pathological condition of a patient, but that such condition in every instance would be the "indication for my advice"; that the proposed clinic would "not be merely a lecture room to show people how to use these two mechanical devices"; that it was not the intention to *invite* poor married people into the clinic; and that "we are going to get people,  *  *  *  the doctors and the different agencies who have this problem before them, to send us the cases, and, if we find that they are legitimate cases for our work, we will do it, and if not we will not." In response to questions asked by the court she stated and described two other methods of contraception, of frequent use "among the very poor," which she considered "most injurious," and she further stated that she was sure the said two methods, to be used in the proposed clinic, were never dangerous. The testimony of the four other physicians, called as witnesses by the relatrix, was to the effect that the two methods of contraception, mentioned by Dr. Yarros, had been generally accepted by the medical profession, and that their use was not harmful to the health of the persons using them. The testimony of Dr. Hershfield, and that of the seven other physicians called by the respondents on said motion to vacate, was to the contrary, and to the effect that there were no approved methods of contraception.

Exhaustive printed briefs and arguments have been filed in this court by counsel representing the respective parties. While many legal questions claimed to

be involved are presented for our determination, much of the argument relates to certain social conditions and sociological questions, which, as said in *People v. Sanger,* 222 N. Y. 192, 195, "are matters for the legislature and not for the courts," and which are of such a character as not to require discussion here. Among the legal points urged by respondents for a reversal of the judgment awarding the writ of mandamus are, in substance, the following:

(1) Neither the petition nor the evidence discloses that the proposed Parents' Clinic is a dispensary or clinic, as defined by the city ordinances, and, hence, petitioner is not entitled to the license demanded.

(2) But assuming the proposed clinic to be a clinic as so defined, yet petitioner is not entitled to the license, for the reason that the ordinances require certain conditions to be complied with by an applicant before a license shall issue, and those conditions were not sufficiently complied with.

(3) The purpose and proposed operation of the clinic are contrary to a sound public policy, contrary to the laws of many States of the Union, and are against the spirit and intent of certain city ordinances (sections 2671-2-3, Chicago Municipal Code, 1922).

(4) Under the issues of fact framed by the pleadings the burden was upon the petitioner to show that there were "approved methods of contraception" and that the particular methods proposed to be taught at said clinic were approved methods and were not harmful, and that petitioner failed to sustain the burden by a preponderance of the evidence.

(5) Under said ordinances the respondent, Bundesen, health commissioner of the city, was vested with a discretion in the matter of recommending or not recommending to the mayor the issuance of a license to petitioner upon her amended application, and the evidence does not show any abuse of discretion on Bundesen's part in refusing to recommend the issu-

ance of such license, or on the part of the mayor, William E. Dever, in refusing to issue the same without such recommendation.

After considering the pleadings, the ordinances, the application for a license and the evidence, we have reached the conclusion that the judgment awarding the writ should be reversed, and upon said fifth point. We deem it unnecessary to enter into a discussion of the other legal points made, further than to say that in our opinion they are not wholly lacking in merit. As to the fifth point, it is "well settled in this State that the writ of mandamus will not issue unless the petitioner shows a clear legal right to the writ, or unless the party applying for it shows a clear obligation on the part of the party against whom the writ is sought, to do the thing which the petitioner seeks to have performed. It will not be awarded in a doubtful case, but only where the right of the relator is clear and undeniable and the party sought to be coerced is bound to act." (*People v. Blair,* 292 Ill. 139, 144; *Quernheim v. Asselmeier,* 296 Ill. 494, 499.) And "courts, in the exercise of wise judicial discretion, may, in view of the consequences attendant upon the issuing of a writ of mandamus, refuse the writ though the petitioner has a clear legal right for which mandamus is an appropriate remedy." (*People v. Board of Supervisors,* 185 Ill. 288, 293.) It is also well settled that the writ should not issue to control or review the exercise of the discretion of any State or municipal board, or officer, where the act sought to be enforced is *quasi*-judicial in its character, unless there has been a clear abuse of that discretion. (26 Cyc. pp. 156-161; High's Extra. Legal Rem., 3rd ed., sec. 327; *People v. Dental Examiners,* 110 Ill. 180, 185; *People v. Board Com'rs Cook Co.,* 176 Ill. 576, 580; *Harrison v. People,* 222 Ill. 150, 153; *People v. Schuettler,* 209 Ill. App. 588, 590.) Under the ordinances in question we think that the respond-

ent, Bundesen, health commissioner of the city, was clothed with a discretion as to whether or not he would recommend the issuance of the license under the application, and that, under the pleadings and the facts in evidence, he was not guilty of any abuse of discretion in acting as he did. The same may be said as to the action of the other respondent, William E. Dever, mayor of the city, in refusing to issue the license after Bundesen had refused to recommend its issuance. In *People v. Schuettler, supra,* the relator sought by mandamus to compel the general superintendent of police of Chicago to grant a permit to exhibit a certain moving picture called "Margaret Sanger in Birth Control." On the hearing the court directed a verdict for the petitioner and adjudged that the writ issue. On appeal to this Appellate Court the judgment was reversed. From the opinion, 209 Ill. App. 588, 590, it appears that the picture in question was "one suggesting and encouraging the use of certain means of preventing conception," and that two issues were involved: "Whether the picture was 'immoral,' and if there could reasonably be different views thereon," and "whether there was an abuse of power in refusing a permit." And we said: "Even though a jury might decide that, acting as a censor, they would grant a permit, it would not follow, so long as there is latitude for exercise of a sound discretion, that the act of refusal would be arbitrary or capricious. The law does not contemplate a transfer of the censor's function to a court and jury, or that they shall sit in judgment on the exercise of his power unless it is arbitrarily or capriciously exercised. His duties are *quasi*-judicial in their nature, requiring the exercise of a sound discretion, with which courts will not generally interfere except in a case of abuse." But it is urged by counsel for petitioner that, in the ordinances here in question, no discre-

tion is reserved to the health commissioner. We do not so read the ordinances. And the holding of our Supreme Court in *Harrison v. People, supra,* is contrary to counsel's contention. In that case it is said (222 Ill. 150, 153): "Of course, where an ordinance authorizes the issuing of a license to keep a dram-shop upon certain terms and conditions, the authorities authorized to grant the license cannot arbitrarily refuse the same, nor discriminate between persons, places and regulations pertaining to the business, without reasonable grounds therefor.    *    *    *    We are, however, of the opinion that there is vested in such authorities, unless expressly restricted by the language of the ordinance, a discretionary power, which may be reasonably exercised in the granting or refusing to issue a license. The question does not seem to have been directly passed upon by this court, but the authorities from other States fully sustain this reasonable construction. In many of these cases the language of the law or ordinance authorizing the granting of the license is, that upon the doing of certain things the licensing officer or body shall grant the license; but the decisions are to the effect that nevertheless a discretion exists in such officer or body, and that they will not be compelled to issue a license when in their discretion, reasonably and fairly exercised, the license has been refused." (Citing cases.) This holding has been followed in the case of *Block v. City of Chicago,* 239 Ill. 251, 263.

For the reasons indicated the judgment of the circuit court is reversed for errors of law, and the cause is not remanded because the errors cannot be obviated or cured on another trial. (*Harty Bros. & Harty Co. v. Polakow,* 237 Ill. 559, 567.)

*Reversed.*

FITCH, P. J., and BARNES, J., concur.